Hear ye, hear ye. This Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the first case on the docket this morning is 2-22-0426, Waukegan Gaming, LLC v. Appellate v. City of Waukegan v. Appellate. Arguing on behalf of the Appellate, Mr. Michael H. Oirana. Arguing on behalf of the Appellate, Mr. Glenn T. Davis. Good morning, counsel. We're going to set up our third member somehow. I am present, Justice Hutchinson. I am having some technical difficulties with the audio. We just didn't even see evidence of you, so I'm glad you're there. Thank you. Okay. Then, that being the case, we are ready to proceed, and Mr. Oirana, you may go forward. Good morning, Your Honor. Good morning. May it please the Court, I am Michael Oirana. I represent Waukegan Gaming and its principal, Mr. Alan Ludwig, who is in court today. Now, as I understand it, casino gambling is problematic for many people on many different levels. And I think that some of that is reflected in the decision by Judge Baronis. Casino gaming has been licensed and authorized in Illinois since February of 1990. The first casino, Riverboat Casino, opened in 1991 in Alton, Illinois. The contract that's the subject of this dispute was entered in January of 2005, but it was preceded by a contract that was entered into in 1993. Well, as you said, let me just, I apologize for interrupting, but as you said, it's been around for some time, but it's also been tweaked, modified, significantly amended, several different levels of participation by the legislature to change it, and this case appears to have something to do with one of those changes. Correct, Your Honor. All right. Okay, so what this appeal has to do with is the 1990, 1919, 2019 amendments. Oh, please. I'm going back. I'm showing my age here. The 2019 amendments, which really, the original act authorized 10 riverboats, casinos, and then in 2019, they authorized six more. In between that, there were amendments, and that all related to one of the original 10 riverboats that was authorized that went bankrupt, and then they had to deal with how do we reissue this license. Okay. So those are the amendments that were made, but the significant amendments we're concerned with here is the 2019 amendments. Didn't the 2019 legislation expressly limit home rule powers? No. The original legislation said the home rule powers will not apply to the regulation and licensing of casinos, so that's the exclusive jurisdiction of the Illinois Gaming Board. But the new legislation limited a lot of these contractual agreements to be solely governed by the state of Illinois. No, I don't think that's true. The new legislation authorized the six licenses. The only thing it required with respect to the individual municipalities or regions where the new casinos were going is that, in this case, the city and the developer that the city chose was required to enter into good faith negotiations and agree to certain things, and that's specifically spelled out in the Act, in this Section 7E5, which is really the big new section of the Act. So Section 7E5 says that the developer and the city have to negotiate in good faith. They have to agree on a permanent location for the casino. They have to agree on a temporary location for the casino. They have to agree on zoning, licensing, and other public health similar issues, and then the city would then have to pass a resolution approving gaming within the limits of the city. That's all it requires. Well, but if you look at 7E5, and that's what we're talking about here, there are six subdivisions of that E5, and I don't see a city except afterwards. It says the board may issue, the board may issue, the board may issue, the board may issue, the board may issue, the board may issue. They're not talking about anybody else issuing the license. Right. Right. But what they require is, if you just read beyond that, Your Honor, if you look, not the paragraph just below that, but the next paragraph below it, it says the board shall consider issuing a license pursuant to Paragraphs 1 through 6. Again, the board issues the licenses and then regulates the casino. It says the board shall consider issuing a license pursuant to Paragraphs 1 through 6 to the six designated locations only after the corporate authority of the municipality or the county board in which the Riverboda Casino shall be located has certified to the board the following. And then there's eight items listed. Correct. Okay? And those, the first six of those items are the ones I was just talking about. They have to negotiate with the developer. They pick, the city designates the developer and certifies it to the board. Before it certifies it, it has to enter into an agreement with the developer addressing, in our case, the first six of these issues. Again, negotiating good faith, pick a permanent and a temporary location, agree on the percentage of revenues, and then agree on other issues. So that's all that the new act requires the city to do. How about 10.7.8, where it states that the regulation and licensing of organization gaming licenses and gaming conduct that's pursuant to an organization gaming license are exclusive powers and functions of the state. Right. A home rule unit may not regulate or license such gaming or organization gaming licenses. That's what I think. Yes, that's a home rule limitation. Right. But what that's talking about is licensing and regulating. Once the developer and the city agree on where the casino's going to go, what percentage income the city's going to get from it, and these other things I just described, then the city certifies that developer to the gaming board. The gaming board then exercises its licensing function and thereafter its total regulation. So your client could build, could set up where he's going to build it and do everything and then not get the license. Yes, absolutely. Absolutely. I mean, he could, in our situation, although we had the exclusive agreement, we still had to agree to these six things, the location, the revenue sharing, all those. We had to agree to that before we could even apply for the license. And the city had to certify us before we could apply to the license. But there's nothing in this legislation that suggests what the trial court found and what the city argues, and that is in order to pick a developer, that the city had to conduct some kind of open and competitive bidding process. It simply doesn't exist. It's not required. It doesn't exist. And in fact, in certain circumstances, there was no open competitive bidding by anybody. In our situation, we had an agreement. We had been working for the city for 26 years trying to get a license for the city, a lobbying. When two licenses became available, we applied for those. Those are, you know, the lobbying went on for 26 years. And as I think you can tell from this bill, there were a lot of changes, a lot of different bills, a lot of different interests trying to be accommodated. And, you know, our goal was to get a license for Joaquin. Having a license in your city is a great benefit, provides a lot of tax income, it provides jobs, and it provides economic growth for the community. So getting a license for the city of Joaquin, getting Joaquin designated in the legislation as one of the locations where a license could be issued was an important first step, and that's what we were hired to do back in 1993, and that's what we did until the 2019. So when you say that's what we were hired to do, this contract that you've talked about actually required payments from the city to the Joaquin Gambling or whatever it was at the time, because it's changed names once or twice. No, what the contracts did is authorize Joaquin Gaming to pursue a casino for the city. The city, in the 26 years we had a contract with the city, the city never paid a dime. Well, you said hired. Hired is lying. That there is a monetary relationship. I misspoke, Your Honor. No, not at all. Because I had not seen it in here, and all of a sudden you used the word hired. Right, and I apologize. That was a poor choice of words. So the agreement simply authorized us to pursue a casino for the city, the first step being get a license, because nobody would suggest, as the city suggests, that the agreement between my client and the city authorized us to operate a casino. That's simply not what the agreement says. And so where did this break down? What's been the timeline on the breakdown? Sure. So in 2019, after 26 years, the General Assembly passes the amendment authorizing a casino for Joaquin. Unbeknownst to us, the mayor of Joaquin had been communicating with an individual named Michael Bond, a former state senator, to get him to open a casino in Joaquin. And as we detailed in our complaint, Mr. Bond and the mayor were working together to make sure Mr. Bond's group got the casino. And all of a sudden, at literally the 11th hour after the General Assembly passed the bill but before the governor had signed it, we get a letter from the city attorney saying, this agreement is not enforceable at this time. What do you think Bond meant when he texted the mayor saying on the day the legislation is going to be passed? What do you think he meant when he said, oh, this is the big day? I mean, do you think that he interpreted this language of the legislation differently than you do? No. He was saying that this is the big day because Joaquin is going to be designated as one of the cities that can get a license. So now we can pursue our goal to get that license for my group. That's what they were excited about. The legislation that was passed said there could be no further communication between the city and any applicant for a license after that point, so he mentioned that too. So we can't have our conversations anymore about who's going to get the license. So what happened to my client is he worked for 26 years. He worked hard. He spent a lot of money. He's a decent man. He got through what we allege is corruption, got denied his opportunity to apply for a license, develop a casino in the city. And so he was not even allowed to or this group was not even allowed to apply for that license? No. What happened was he had the exclusive right. In exchange for that 26 years of effort, he had the exclusive right so he wouldn't have to compete for the license for 26 years. But was that allowed? Sure. Sure. Absolutely. There's nothing in the Act, as you can see, nothing in the Act that says the city can't pick a developer. It wants to develop a casino in the city. Nothing in the Act says they can pick anybody they wanted. So isn't the purpose behind the legislation to make it a competitive bidding process as opposed to the city saying it's you? No, not at all. There's nothing. In fact, the only mention of a competitive bidding process in the Act is Section 75 and 712. And 712 was the one that was added with the 2019 amendments. And that section simply says that the gaming board may issue a license pursuant to a competitive bidding process as the one described in Section 5. Would you submit it doesn't apply here because we didn't have multiple bidders? Correct. And the city attached to its brief, Hyperlink, that took you to a press release that the gaming board issued on April 5th of 2021 after the amendments had been made. And that press release specifically says, in circumstances where multiple applicants are seeking a single new license within the same host community, the board will conduct an open and competitive bidding process before issuing the license pursuant to Section 712. It then goes on to say the board will use the competitive bidding process to award a casino license for which there is more than one applicant. Okay? And then it says currently the board has more than one applicant for only two casino licenses, Waukegan and the south suburbs of Chicago. And in fact, those would be the only two that submitted multiple applicants and those are the only two that were involved in a competitive bidding process. So it's not more than one applicant for Waukegan, but more than one applicant for the license. For the license. So the city could certify under the amendment one developer, as four of the six cities did, or they could certify multiple developers and then let the gaming board pick. And then the gaming board could do that pursuant to the open and competitive gaming process. So there was nothing wrong with what happened here. The city had made an agreement years ago with my client to develop the casino in Waukegan. My client's first goal and obligation was to get a license to begin the development. It pursued that actively for many years and we say and we will show that we were very instrumental in making sure Waukegan was one of the six communities in the entire state that was identified as the recipient of a license. So they got the benefit of their bargain. They got the license and there's a casino open there now and they're making money and they have jobs and there's economic development. So they got the benefit of their bargain. But because of this corruption, our clients were foreclosed from their exclusive.  And didn't get the benefit of the bargain. And did it have, I mean, one of the, as you said, in these six considerations that the city goes through to negotiate with, and let's forget the exclusivity at this point. Yeah. If they negotiated and dealt in good faith and the things that were required there and got, let us say, a better deal from another group, you say that is not appropriate? No, no. Those requirements were for the developer the city was selecting. Right. If you, in this case, if you ignore the exclusivity, they would have to negotiate with whoever they were going to certify. In other words, the step is we pick a developer or developers, we negotiate these six items, and then we certify a developer or multiple developers. The exclusivity, in our case, simply prohibited the city from negotiating with multiple developers at that point. It had to negotiate with us. And we had a reaching agreement and they had to certify us. So we weren't locked. And then, of course, we had to go to the gaming board. And that is an expensive process. It takes many, many months, a lot of work, a lot of expense to get approved for a license, as you can imagine. So we got locked with the first step. We didn't get our exclusivity. And that's, you know, why we're here today. Counselor, your time is up at this point. And you will have an opportunity to reply if you wish. Thank you very much. Oh, I'm sorry. Oh, Anne, yes, I'm sorry. Justice Jorgensen, do you have any questions? I do have one question. Counsel, is it your position that in 1993 the city of Waukegan could enter into an agreement that would bind the city for 26 years through multiple administrations and changes in local government? Yes. Yes, it is, Your Honor. And on that point, the city argues, of course, it couldn't do that. Well, primarily because it says that a sitting mayor or a city council cannot bind the city to agreements that extend beyond their term. The only cases that have ever applied that rule are the Milliken case and the Canizo case, which both parties cite. But that was a situation where they were talking about an employment agreement, where if you're the mayor and you want to employ somebody to work for you during your term, you can't sign a long-term employment agreement for that employee that would bind the next administration to this person. No administration probably would like to hire someone else. And, in fact, those decisions have now been codified in the municipal code, where it specifically now limits the ability of a sitting either a mayor or official who's hiring somebody to work for them, limits their employment agreements to the term of those people. But development agreements such as this, where you're developing a property, they, by nature, go on for many years. And, of course, any development agreement a city's going to enter into, and they enter into them all the time, is going to extend over many years. What could have happened here is if a new administration came in and didn't like this agreement, they didn't have to renew it. It was renewed multiple times. In our case, even the 2004 agreement was modified several times. The new administration could have renegotiated or done something like that. But there's no problem with a city entering into a development agreement that extends beyond the term of the current officers or mayor of the city. What are you seeking should we ruin your favor? Well, the court said that the agreement wasn't unenforceable. So what we're seeking is a reversal of that decision, saying that the agreement wasn't unenforceable. There's no question the city breached it. That's not even an issue. And so our primary account is breach of contract. So all we're looking for from this court is to say, no, this contract was enforceable, and that's it. The court will go back and, you know, we'll deal with the breach issue and the damage issue. And so that's all we're seeking. Thank you. Thank you. Justice Jorgenson, did that raise any other questions for you? I have no additional questions. Thank you. All right. You may proceed. Good morning, ladies and gentlemen. Again, I'm Glenn Davis, and I'm with Pepper Broom, and I'm here on behalf of the city of Waukegan. And greetings to you, Justice Jorgenson. Now we know who you are over there. There's a lot to unpack here, but it's not hard. Well, let's, if I may, while it's still fresh in my mind, what about the last question that Justice Jorgenson asked? This 1993 agreement, can it extend through 2019? No, it cannot. And why not? If you look at the timeline here, the original agreement was over 30 years ago. The redevelopment agreement was 20 years ago. And the city's obligation to give land for this project expired 10 years ago. So there are multiple year periods here to deal with. The question is whether or not one administration can bind future administrations to this sort of an agreement. Is there legislation that will bar that? And that is the answer. Because in a normal development or real estate deal such as that, that's an exercise of the home rule powers of the city. This is not. The home rule powers of the city are expressly excluded by the O-Line Gaming Act. And here you cannot have that power exercised in a manner that in essence regulates gaming within the borders of the city of Waukegan. So the premise is wrong that this is not regulation of gaming. And the second part is that you cannot bind future administrations indefinitely. And this is an indefinite agreement. It has no term that ends. Your opponent believes, Mr. Moran believes that that language of exclusivity is not applicable to that contract that was entered into previously by his clients. Based on the new legislation. The exclusivity is derived from the redevelopment agreement of 2004 and its predecessor agreements. There's no question about that. Now, whether or not one can have exclusivity granted by the city in this circumstance, in our view is essentially assuming a regulatory aspect of this by preordaining or dictating who can be presented to the gaming board for approval. The context here is that the cities are being asked to conduct a process in this context to advance one or more suitable candidates to receive a license from the state. Now, we've had reference to the competitive bidding language and where does that come into play? And there was reference to section 7.5 and 7.12 of the act. And 7.12 is critical here. And where they, their whole argument boils down to that only applies, the competitive bidding, express competitive bidding language only applies at the gaming board level. If you have more than one. Right. But that's not, that cannot be true. Because if the city can dictate in advance that there's only going to be one candidate, even 30 years earlier, then the gaming board's hands are tied. They argue that, well, at the gaming board level, whether a qualified applicant is going to be advanced, competitive bidding is discretionary. That's incorrect. Their interpretation of 7.12a is simply wrong. What do you submit the intent of this legislation? The intent of this legislation is to protect the public by providing for advancement of the most, with the most integrity of the most beneficial gaming opportunities to the public that can be derived. And here we have a statute that provides that the General Assembly authorize the board, the gaming board, to issue licenses to a qualified applicant pursuant to an open and competitive bidding process, as set forth in section 7.5. There is no separation in the language there that this is somehow discretionary. There's no breakup of that clause that can be construed in a manner to make a competitive bidding process discretionary. That is an illogical reading and would create completely superfluous language in this act that would never, ever come into play when there's one applicant. But the competitive bidding, according to the statute, is before the board. How does that extend to the city? Because if the city, in the way this is all structured, presents the board with only one candidate and has limited itself 30 years ago by contract to only advance this one party, regardless of what other opportunities are available, then the gaming board can only act on what's in front of it, which is this one party. Which is one party bond? No, which is, in their view of the world, there would be, you know, one party is... Is that... You know, factually, we can dispense with bond immediately. We're not here to contradict any facts stated in the complaint. This is a motion to dismiss, basically. They can say all that if they want. It's not true, but we can say all that if we want. But Bond's proposal, by the way, was rejected. So he was never advanced through the whole process to receive a license. Full House received the license. There was reference to, well, did Mr. Did the gaming, Walking In Gaming, advance their own proposal? And they did not. Mr. Ludwig became part of a joint venture that applied with Rush Street Gaming and Churchill Downs. And then they backed out of the process after they were advanced by the city to the gaming board as one of three for consideration by the gaming board. The city conducted a fair, lengthy, and expensive process here to present, through a competitive bidding process, three suitable suitors for this license. Well, I understand that Churchill Downs was the lead. By agreement of these parties, they were going to be the presenter. But wouldn't that have included Mr. Ludwig's group? It did. But Mr. Ludwig could have independently have advanced Walking In Gaming as a suitor alongside or with the others to seek his own. He participated in that. Well, he participated in that as an individual, and I believe as another entity, but not as Walking In Gaming, the signatory to the development agreement. Now, we can check the record on that, but that's my understanding. But the city's role here, once again, is to advance, in its judgment, who the most suitable candidate is for the license. That's all set out and required in the Illinois Gaming Act and its regulations. And that's exactly what the city did. How quickly after that legislation was passed and did Mr. Ludwig get the letter from Mayor Cunningham that he did not get the bid? That letter arrived somewhere around 30 days afterwards. This was a very intense time period. This act was approved in the late spring, May, or early June of 2019. And the city interpreted this act as we interpret it still today to require a competitive bidding process issued in RFP in the first part of June. So it would have all happened, all of that would have happened in this first May, June, 2019. So he was in the competitive bidding process. He was available to him, and he was in it as part of the joint venture, which he later left to pursue a different opportunity for Chicago. So Judge Baronis, you know, gave multiple independent legal grounds for dismissal. And I think it's obvious to you all that in order to reverse, you have to disagree with him on every single one of those. And we adhere to all of our arguments in those that are brief. But we, you know, first and foremost believe that the Illinois Gaming Act as the exclusive method for the city to select suitable candidates, that is the dispositive issue here. And the rest is additional arguments that support us but are not necessary for you to even reach. So, you know, their agreement, by the way, in 2004, and its predecessors going back, could not have possibly included all of the requirements in the Illinois Gaming Act amendments of 2019. And we've been through 7.25E and all these things that you have to certify by resolution. None of those were part of the agreement or any proposal by Waukegan Gaming. So you're saying the legislation superseded that? It did, and it preempted it entirely. It's something that you cannot harmonize. And the only way to harmonize this is to find, as Judge Baronis did, that the Gaming Act is the sole means to consider this preliminary process and then the Gaming Board decides who gets it. So... Was there anything preventing this Waukegan Gaming from still being... Well, they were part of the process, but they could have done everything that is required by the statute, or they could have tried to, correct? They could have participated, they could have done that. And if they had produced their proposal first, and I have a timeline here, they could have satisfied all of those, and that might have solved the problem, correct? Well, I don't believe it would have solved the problem because we still have the issue of whether or not a competitive bidding process is required. And you have the exclusivity provision dating back to 1993 at war with the now required competitive bidding process. And so with the competitive bidding process in place, you cannot have someone preordained decades earlier to be the sole person. That way, among the requirements, you have to have a hearing. The city had to have a hearing to present this proposal for public consideration. And so what would be the point in 2019 of holding a public hearing if Waukegan Gaming is already preordained as the exclusive candidate? We can't even talk to anybody else about anything related to the topic. Well, to make sure that all of the conditions of 2019 would have been met. But consideration of none of the others in a competitive bidding process. So our position, you know, our position is that the Gaming Act, certainly, and the legislature was entitled to amend the act in a way that affected and voided the prior agreements of the parties here. This was not something that city of Waukegan dreamed up to get out of a contract. This was legislative action. This was not something that, you know, we're trying to welch on an agreement or something like that. This is something that required us to go the route that we did. There's no legal trickery or evasion here. But doesn't, you know, I know you think that the texts between Cunningham and Bond aren't relevant. But when you say, well, this is not like the city is trying to welch on a contract. But doesn't that raise some question on the intent of the city when you see that type of conversation back and forth? Whether the intent of the mayor, by the way, who doesn't have a vote, whether the intent of the mayor was to confer with Mr. Bond about something, has no impact on this issue of whether the contract is void by the legislative action. I understand what you're saying, but you just said there's no, you know, the city wasn't trying to do anything. It kind of puts a question in your mind about whether the city is trying to do anything when you read these texts and these communications between Cunningham and Bond. The city has been put through the wringer on this. We have been sued by parties that said we didn't do enough process. We're now sued by parties saying we did too much process. This is, you know, the levels of absurdity one reaches when you keep digging here is hard to imagine. But the decision to go beyond Waukegan Gaming in this, after 2019, was that done with conversation with council or was it done at a meeting where the city council, city board, whatever they're called in Waukegan, said, okay, this is what we have to do, notwithstanding the 2004 agreement? Both. I mean, there wasn't necessarily a reference to a 2004 agreement. In fact, the city filed a declaratory judgment case seeking to invalidate the, you know, to get a legal declaration that this was not binding anymore. Because when they met with the Waukegan Gaming folks, there was a disagreement and they couldn't agree on whether or not it was still alive. Who was the mayor at the time when the contract was entered in? Oh, you've got me there. That goes back to 2000, goes back to 1993. It's in our brief, I believe. So our position really harmonizes this process. Otherwise, you're rendering the competitive bidding requirement completely superfluous, the hearing requirement superfluous. You're going to make distinctions without a difference, such as to reverse, such as regulation of gaming does not equal controlling exactly who can obtain a license within the borders of the city, who can apply for it. So I would be happy to rely on our briefs for the rest. But if you have any other questions, I'm... I will consult with Justice Jorgensen. Justice Jorgensen, do you have any questions? Good morning, counsel. I do have one general area of inquiry. Is it your position that the city never had authority to enter into this contract or only lost its authority to do so after the 2019 amendments? As we have argued in our brief, it never had the authority, and we have also urged that the amendments reinforced why it did not have authority and made that very clear. So given the fact that it did not have authority to proceed with the 2004 amendment, I mean, that even supersedes the beginning of this saga. So it was unenforceable from the beginning? That's our position. There was lack of authority to enter into this agreement. On what basis? Even under a home rule theory? Well, because the home rule was debatable even at that point, but beyond that, this agreement had an indefinite term, and so it was terminable at will, but it also was improper from the beginning because of its restriction on all future administrations to do something different. And by the way, on that point, that area of law, as pointed out in our brief, is not limited to employment. I believe we cited cases or other development issues that are also restricted. The general police power possessed by a city is continuing and cannot divest itself by contract or otherwise. Did the contract initially not say 20 years and then 10 and 10? That was an alternative, and Judge Farrell has correctly found that the intent of the parties was for it to be an indefinite term agreement, to continue as long as the casino was operating. But if it is raised that Illinois law requires something more definite, then this is what it would be. Well, the law, you said, notes that when the parties have failed to agree on a contract's duration, the contract is construed as terminable at will. Correct. Of either party. So if you had terms in this contract, which you do, 20 and then 10 and 10. Only if Illinois law required it, which it does not. I have nothing further. Justice Jorgenson? No, I have no further questions. Thank you, counsel. Thank you very much. I appreciate it. Thank you. Mr. Marano? Thank you. Just to clarify a couple of points. The agreement we entered into back in 1993 was an agreement where, in exchange for exclusivity, we would pursue a license and then develop and operate the casino. So exclusivity was important to us from the beginning because we didn't want to spend all this time, money, and effort, and then we get the license and we're ready to go, and then they say, oh, well, we're going to pick somebody else to take over. So exclusivity was the consideration that we got under our agreement with the city, and that's why we had it. Otherwise, we'd spend all our time, get the license, or get the opportunity for Buckingham to have a casino, and then the city could pick Mr. Bond. We wanted to avoid that. The Gaming Act says absolutely nothing about open and competitive bidding at the city level when the city is selecting the developer it wants to develop a casino in the city. There is nothing in the Act that talks about that at all. Section 712, as you pointed out, Justice Hutchinson, is strictly limited to the gaming board when it has multiple applicants seeking, applying for the license. So we're talking about at the city level, there is no open and competitive requirement at all. And, in fact, the Illinois law is very clear on this, that unless there's a statute that says there has to be open and competitive bidding for a particular contract, then there is no requirement or no prerequisite for opening bidding. So you're saying that the other two people who bid should not have been allowed to bid because you had excluded them. Correct, correct. And let me just clarify what happened there. And this did happen very quickly. So what happened is the bill was passed in May of 2019 by the General Assembly. But Governor Pritzker didn't sign the bill until June 28th of 2019. Five days later, on July 3rd, we got the letter. So the bill became law on June 28th. We got the letter three days later. And under the bill, anybody certified by the city to be the developer had to submit its license application within 120 days, so mid-October. And that's a big process. So this was a very quick timeline. My client, at that point, gets a letter from the city, says, You're out. They file a lawsuit a few days later saying, We get to pick who the developer is. We know about bond. We know what's happening here. Okay. So my client is approached by somebody else. We're in a lawsuit with the city. We file a counterclaim. We're approached by the Rush Street Gaming, the Rivers Casino people, and Churchill Downs. And they say, Would you join our effort? Because we want to get involved in that litigation for our, you know, to use it in their process. Well, they said, Who be involved in our? Mr. Ludwig, not Waukegan Gaming. Mr. Ludwig and he had a partner at that time, Mr. Stein, were offered an opportunity to participate with Rush Street Gaming and Churchill Downs. And at that point, they're like, Oh, my God. We have to submit a license in 120 days. We had a lawsuit, but, you know, I was representing them in that lawsuit. I told them, We don't know when this lawsuit is going to be resolved. So they tried to mitigate their damage. All they wanted to do was develop a casino in Waukegan. So they tried to mitigate their damage by making that. So Mr. Ludwig is sort of bidding against himself? No, at that point, Waukegan Gaming was out. Waukegan Gaming was out at that point. They already got a letter, another opportunity presented. Okay. I thought out meant that they'd have to go through the process. But you're saying it meant they couldn't do anything. No, their exclusivity was out. Right. Okay. They could, you know. They could have applied. They could have applied, but they would have had to do what they did, is make a deal with a casino partner, you know, do all these things. But that, you know, that wasn't what they bargained for back in the beginning. What they bargained for was to avoid all that. And that's what they did for 26 years and are simply here looking for the benefit of that arc. Just one other thing I wanted to clarify. The public hearing that counsel talked about, this isn't a public hearing by the city to pick a developer. The statute specifically says a public hearing is after you pick a developer and after you make the agreement on the six things, where it's going to be, how much we're going to get, then the city, not the developer, the city has a public hearing, says here's the deal we made, here's the casino we're going to build. To develop who the license goes to. Right. Exactly. And that's what a public hearing is about. It's not the developer. And if I could just address Justice Dorganson's question. This did not have the authority. They alleged that the agreement was, that the city never had the authority to enter into the agreement for two reasons. One, they claimed that the agreement authorized Waukegan Gaming to conduct casino gambling in the city. And that that's the exclusive province of the gaming board. Well, the agreement is, that's a ridiculous argument. The agreement didn't authorize Waukegan Gaming to begin opening a casino in the city. It said Waukegan Gaming, go get a license and we will allow you to develop a casino in our city. So that was the one argument for why the agreement was unauthorized and unenforceable from the beginning. The second argument was this, an agreement can't bind one mayor, one city council beyond its original term. Council says there's cases that say that beyond the employment context. Absolutely not true. There's no case that says that. And there's multiple cases dealing with development agreements the last years and years and years. Thank you. If there's no other questions, I appreciate this very much. Justice Jorgensen, do you have any questions? No, I have no additional questions. Counsel, thank you very much. Thank you. Justice Shostak? No, I'm good. Thank you very much. All right. Thank you, gentlemen, for this unusual hearing. Technology is great, but sometimes it just has a glitch and that's what happened today. So although I kept looking at Justice Jorgensen, who is not there. We heard her. We heard her. We appreciate your understanding of the circumstance. And she obviously heard you as well, and that's the important thing. So we will take this matter under advisement, issue a decision in due course, and we will stand in recess now to prepare for our next hearing. Thank you.